UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

CHARLIE HERNANDEZ,

Defendant.

24 Cr. 447 (RA)

**GOVERNMENT'S SENTENCING MEMORANDUM**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Benjamin A. Gianforti
Assistant United States Attorney
 -Of Counsel-

**Table of Contents**

I.    Background ..................................................................................................... 2

    A.    Offense Conduct ...................................................................................... 2

        1.    KCM Status and Money Transmission Laws ............................. 2

        2.    CW-1's MLO ............................................................................... 3

    B.    Procedural History .................................................................................. 5

    C.    The Sentencing Guidelines ..................................................................... 6

II.    Argument ....................................................................................................... 6

    A.    The Governing Legal Framework ........................................................... 6

    B.    The Court Should Impose a Sentence of Approximately 3
        Months' Imprisonment ........................................................................... 9

        1.    The Nature and Seriousness of the Offense, and the Need
            to Provide Just Punishment ..................................................... 9

        2.    The Need to Promote Respect for the Law and to Afford
            Adequate Deterrence ............................................................... 10

        3.    The History and Characteristics of the Defendant ................... 11

III.    Conclusion .................................................................................................... 12

For a period of approximately 5 years, former flight attendant Charlie Hernandez moonlighted as a money mule for an international money laundering operation ("MLO") that funneled drug money from New York City to the Dominican Republic. As a flight attendant for Jet Blue Airlines ("Jet Blue"), Hernandez was the perfect mule because he had "Known Crewmember" ("KCM") status with the Transportation Security Administration ("TSA"), which allowed him to slip through airport security in the dedicated KCM lane at JFK International Airport ("JFK") with little to no scrutiny. In exchange for a few percentage points on each money run, Hernandez would smuggle bulk cash generated from local narcotics sales through airport security and then hand it off to another member of the MLO in the Dominican Republic. He did this repeatedly, apparently never stopping to consider that he was fueling the scourge that is the international drug trade. He was part of a network of flight attendants who did this for the MLO, and only stopped when another flight attendant carrying cash for the MLO got stopped by Customs and Border Protection ("CBP") and the funds were confiscated.

The United States Probation Office ("Probation") calculates the sentencing Guidelines applicable to Hernandez as 24 to 30 months' imprisonment, and recommends a below-Guidelines sentence of 18 months' imprisonment. Hernandez asks for even greater leniency in seeking a sentence of home confinement. Though the offense conduct at issue here was very serious, the Government respectfully suggests a middle path of a short sentence of approximately 3 months' imprisonment, to be followed by 3 years' supervised release, due to the unique mitigating factors relevant to this

defendant. Such a sentence is well supported by the record and would be sufficient but not greater than necessary to serve the ends of Section 3553(a).

## I.    Background

### A.    Offense Conduct

#### 1.    KCM Status and Money Transmission Laws

Large-scale narcotics suppliers who ply their wares in the United States often end up with the problem of having a significant amount of cash on hand in the United States that they would like to have access to and spend back home. (PSR ¶ 10). Unable to reliably use traditional banks to wire this cash out of the country, for fear of detection and interdiction, drug dealers often come up with more creative ways of getting their money into their pockets. (*Id.*) One common tactic favored by drug dealers based in the Dominican Republic is to enlist flight attendants who work routes between the United States and the Dominican Republic to smuggle large quantities of cash out of the country in exchange for a small percentage of the proceeds smuggled. (*Id.*). In one key respect, flight attendants make ideal money mules: they typically benefit from KCM status with the TSA, which in most cases allows them to breeze through airport security via a dedicated lane without being meaningfully searched. (*Id.*). The defendant had KCM status at all relevant times. (PSR ¶ 11).

Transmission of funds in this way, without a license to do so, is a criminal offense under federal law and the laws of the State of New York. *See* 18 U.S.C. § 1960; N.Y. Banking Law §§ 641, 650. The reason for this is simple: U.S. and New York State authorities seek to disrupt the flow of criminal proceeds just like those at issue here. Licensees are required to, among other things, report suspicious financial activity to

relevant authorities as a means of aiding the detection of the movement of funds derived from criminal activity. Under federal law, a money transmitter must obtain a license from the Financial Crimes Enforcement Network, a division of the U.S. Treasury. (*See* PSR ¶ 13). Under New York law, a money transmitter must obtain a license from the New York State Department of Financial Services. (*See* PSR ¶ 12). Hernandez has never held a federal or state license to operate a money transmission business. (PSR ¶ 14).

### 2. CW-1's MLO

In October 2021, the Government charged an individual ("CW-1") with money laundering and narcotics offenses in connection with CW-1's operation of the MLO into which CW-1 recruited Hernandez in or about 2014. (PSR ¶ 15). CW-1 began cooperating with law enforcement soon after being charged and helped the Government build a case against Hernandez and other flight attendants that CW-1 used to move drug money from New York City to the Dominican Republic. CW-1 has moved millions of dollars for drug dealers in the Dominican Republic. These dealers are known to traffic in, among other things, fentanyl. (PSR ¶ 9). CW-1 personally sold significant quantities of oxycodone, some of which was laced with fentanyl, to undercover agents prior to being charged.

Over the course of the approximately 5 years that Hernandez moonlighted as a money mule for CW-1's MLO, CW-1 estimates that Hernandez smuggled at least $2.5 million in narcotics proceeds out of the United States at CW-1's direction. (PSR ¶ 15). The Government estimates that Hernandez earned thousands of dollars from this side hustle, based on CW-1's estimates of the total amount of cash Hernandez

smuggled and the low percentage-point fee Hernandez charged for this service. Hernandez knew he was moving drug money. (*Id.*). Indeed, at one point, CW-1 took Hernandez to a party in the Dominican Republic where CW-1 introduced Hernandez to a drug dealer who was one of CW-1's money laundering clients. (PSR ¶¶ 15-16).

On or about December 20, 2019, CW-1 met with Hernandez in the Bronx and gave him approximately $121,215 in cash—drug money to be smuggled to the Dominican Republic. (PSR ¶ 17). The same day, Hernandez gave just over half of this amount to his friend and fellow Jet Blue flight attendant, Sarah Valerio Pujols, who was also a member of CW-1's money mule network. (PSR ¶¶ 16-17). Later that day, before boarding a Jet Blue flight to the Dominican Republic that she was scheduled to work, agents with CBP stopped her and explained the restrictions on transporting U.S. currency internationally, including the duty to declare cash being brought out of the country. (PSR ¶ 18). Pujols, who was actually in possession of over $60,000 in cash, lied to the CBP agents and reported that she was only in possession of about $1,000, which she produced for the agents' inspection. (*Id.*). When the agents searched her purse, however, they found the additional $60,000, which they confiscated. (*Id.*). At some point thereafter, Pujols told Hernandez about the stop and Hernandez relayed the information to CW-1. (*Id.*)

Jet Blue fired Pujols as a result of this incident, but Hernandez kept his job because he was not caught until he was charged in this case. (*Id.*). The Government's understanding is that Hernandez stopping working with CW-1 in the wake of Pujols's stop and termination.

### B.    Procedural History

On April 30, 2024, United States Magistrate Judge Sarah L. Cave issued a criminal complaint charging Hernandez and Pujols with operation of an unlicensed money transmission business, in violation of 18 U.S.C. §§ 1960 & 2; conspiracy to operate an unlicensed money transmission business, in violation of 18 U.S.C. §§ 371 & 1960; bulk cash smuggling, in violation of 31 U.S.C. §§ 5332 & 2; and entering an airport or aircraft area in violation of security requirements, in violation of 49 U.S.C. §§ 46314(a) and (b)(1). Hernandez was arrested on May 7, 2024, and presented before United States Magistrate Judge Gary Stein. Hernandez was bailed and has been on pretrial supervision since his arrest, with no issues complying with the terms of his release.

On July 25, 2024, Hernandez pleaded guilty before the Court, pursuant to a plea agreement, to an information charging him with a single count of violating 18 U.S.C. §§ 1960 & 2, in connection with his involvement in CW-1's MLO.[1]

---

[1] Pujols pleaded guilty to the same offense, pursuant to a plea agreement, before United States District Judge Naomi Buchwald on July 23, 2024. *See United States v. Pujols*, No. 24 Cr. 442 (NRB). Pujols is currently scheduled to be sentenced by Judge Buchwald on January 30, 2025.

The Government charged three other flight attendants as part of its takedown of CW-1's money mule network: Emmanuel Torres, Jarol Fabio, and Johanna De Jesus. All three have also pleaded guilty to a 1960 charge, pursuant to a plea agreement. Torres is currently due to be sentenced by United States District Judge Colleen McMahon on January 6, 2025 (this date is likely to move); Fabio is currently due to be sentenced by United States District Judge Arun Subramanian on January 9, 2025; and De Jesus is currently due to be sentenced by United States District Judge Edgardo Ramos on February 12, 2025. *See United States v. Torres*, No. 24 Cr. 474 (CM); *United States v. Fabio*, No. 24 Cr. 481 (AS); *United States v. De Jesus*, No. 24 Cr. 577 (ER).

### C.    The Sentencing Guidelines

The Government and Probation arrived at the same Guidelines calculation in this matter: a base offense level of 16, pursuant to U.S.S.G. § 2S1.1(a)(2); a six-level enhancement because the defendant knew that the laundered funds were the proceeds of narcotics activity, pursuant to U.S.S.G. § 2S1.1(b)(1); a three-level deduction for acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a)-(b); and a further two-level deduction under the Zero-Point Offender Guideline, pursuant to U.S.S.G. § 4C1.1(a), for a total offense level of 17. Hernandez has no criminal history and therefore is in Criminal History Category I. His stipulated Guidelines Range under the plea agreement is 24 to 30 months' imprisonment. (*See* PSR ¶¶ 25-40, 67).

## II.    Argument

### A.    The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark." *Gall v. United States*, 55 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 578 U.S. 189, 200, 204 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)); *see also*, *e.g.*, *United States v. Solis*, 18

F.4th 395, 405 (2d Cir. 2021) ("District courts are to use the Guidelines as a 'starting point' and then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant' and all other statutory factors.").

After that calculation, however, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6);[2] and "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

---

[2] Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008). Because Section 3553(a)(6) was intended to address national disparities, "a district court may—but is not required to—consider sentencing disparity among co-defendants under 18 U.S.C. § 3553(a)(6)." *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009) (citing *United States v. Frias*, 521 F.3d 229, 236 & n.8 (2d Cir. 2008)). By this same logic, this Court may—but is not required to—consider sentencing disparities with other defendants in this District.

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### B.    The Court Should Impose a Sentence of Approximately 3 Months' Imprisonment

A sentence of approximately 3 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offense of conviction, the seriousness of the offense, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, and the history and characteristics of the defendant. A balance of these factors weighs in favor of the Government's recommended sentence, and against the undue leniency Hernandez seeks through his request for home confinement.

### 1.    The Nature and Seriousness of the Offense, and the Need to Provide Just Punishment

The nature, circumstances, and seriousness of the offense and the need for just punishment warrant a term of imprisonment. The international drug trade, and particularly the international trade in opioids like fentanyl and oxycodone, is a scourge in the United States. The opioid epidemic in this country has been well documented and has led to many, many destroyed lives, violence, and obscene wealth for large-scale traffickers like those that made up CW-1's client base. Hernandez was just a small part of this, but nonetheless a vital pipeline for the money that keeps this drug trade running and profitable. He knew what this money was and he smuggled it out of the country again and again and again. He could have found other ways to make a little extra money if he needed it, but, no, he decided to go into the money muling

9

business. Thanks to him, some drug lords in the Dominican Republic are that much richer.

What makes matters worse is that Hernandez abused a position of trust bestowed upon him as a flight attendant with KCM status. Hernandez knew that he could breeze through airport security at JFK with little to no scrutiny. After CW-1 approached him, he learned that this access could be monetized, which he did over and over again. Airports are in many ways the front lines of national security and law enforcement in this country. They have a unique role in helping to screen and disable potential threats and criminal activity. Hernandez thumbed his nose at all of that to make a few bucks.

All of these reasons support a sentence of imprisonment.

### 2.    The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports imposition of a sentence that includes a meaningful term of imprisonment. Again, Hernandez was well aware of the special access to airports that he was granted by virtue of being a flight attendant with KCM status. But he treated that access like an ATM card, demonstrating a profound disrespect for the law.

While the Government agrees in large part with the defense that Hernandez has likely been sufficiently specifically deterred from doing anything like this again, there is still a need for general deterrence here. The Government's arrest of Hernandez, Pujols, and the other flight attendants was well-covered in the press and the

Government hopes that U.S. airlines have started to make changes to address the risk of abuse that comes along with KCM status. But there is nonetheless a need to demonstrate that this kind of abuse comes with serious consequences, including jail time. The risk is that a slap on the wrist like home confinement will not fundamentally change the calculus for others with KCM status: if people have been slipping through the net for so long, and can easily make extra money, those with KCM status may conclude that it is more than worth the risk of facing home confinement. The calculus should be that rolling these dice could land you in jail, with no prospect of employment in the airline industry on the other side.

### 3.    The History and Characteristics of the Defendant

The history and characteristics of the defendant are uniquely mitigating and weigh in favor of an approximately 3-month term of imprisonment, rather than a Guidelines range sentence or even the 18 months suggested by Probation.

Hernandez is a 42 year-old first-time offender. Prior to being arrested and charged in this case, he worked for Jet Blue as a flight attendant for over two decades, culminating in a salary of approximately $110,000 annually before he went on mental health disability at some point that is not specified in the PSR. (PSR ¶ 61). The defendant's relatively robust salary, at least before he went on disability, particularly for someone without children, makes his crime somewhat inexplicable from a financial standpoint, but the Government nonetheless notes that the defendant held a job for over 20 years.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████ While the Government submits that a sentence of incarceration is necessary for the reasons articulated above, the Government's substantially below-Guidelines recommendation is an appropriate disposition in light of these personal characteristics and the other 3553(a) factors. The Bureau of Prisons will be able to attend to the defendant's needs should the Court agree that a short term of imprisonment is warranted here.

## III.    Conclusion

For the reasons set forth above, this Court should sentence Hernandez to approximately 3 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to accomplish the goals set forth in 18 U.S.C. § 3553(a).

Dated:    New York, New York
          December 13, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
    Benjamin A. Gianforti
    Assistant United States Attorney
    (212) 637-2490